In the Matter of the Estate of FREDERICK G. BOURNE, Deceased.

ARTHUR K. BOURNE et al., Appellants; MAY B. STRASS-BURGER et al., Respondents.

Executors and administrators — decedent's estate — sale of real property to residuary legatees — finding by surrogate that sale was valid and that no grounds existed for setting same aside a conclusion of law — when reversal by Appellate Division unjustified — duty of executors upon sale to residuary legatees — obligated to act for best interests of estate and sell property at best price obtainable — insufficiency of evidence to show that sale was intended as partial distribution of estate.

1. A finding by the surrogate, upon trial of objections to an item in executors' accounts, that a sale of certain real property "was validly made and is in all respects valid and that no grounds exist for setting the same aside " is more of a conclusion of law than a finding of fact and its reversal by the Appellate Division is unjustified so long

as other findings in relation to such sale remain undisturbed to the effect that the executors not only acted " in good faith " but fairly and properly, and made no improper or unfair representations to bring about the sale.

2. A suggestion that the executors occupied a fiduciary relation to the purchaser of the property for the reason that she was one of the residuary legatees and for that reason ought not to have permitted her to acquire the property at a price in excess of its value cannot be upheld. No rule of law imposes upon executors any such duty. They were obligated, as executors, to act for the best interest of the estate. That required them to sell the property at the best price obtainable.

3. A finding by the Appellate Division that the sale " was intended and was made as a partial distribution of the decedent's estate " is not only unsupported by the evidence but is contrary to it. The evidence clearly establishes that it was a purchase and sale and nothing else and so understood.

*Matter of Bourne,* 206 App. Div. 762, reversed.

(Argued January 8, 1924; decided February 19, 1924.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered July 5, 1923, which reversed a decree of the Suffolk County Surrogate's Court in so far as it overruled an objection to a certain item of the accounts of the executors and surcharged their accounts with such item.

*H. Snowden Marshall* and *Henry A. Prince* for appellants. The reversal as to the Dark Island transaction by the Appellate Division majority cannot stand unless (1) the new findings of the Appellate Division are based upon evidence which sustains them, and (2) the new findings of the Appellate Division together with the unreversed findings of the surrogate sustain the conclusion of law of the Appellate Division majority reversing the surrogate. (*Hall* v. *O'Brien,* 218 N. Y. 50; *Matter of Houseman,* 224 N. Y. 525; *Andrews* v. *Cohen,* 221 N. Y. 148; *Bonnette* v. *Molloy,* 209 N. Y. 167; Rules of Civ. Prac. rule 239; *Lamport* v. *Smedley,* 213 N. Y. 82; *Acme*

*Realty Co.* v. *Schinasi,* 215 N. Y. 495; *Caldwell* v. *Nicolson,* 235 N. Y. 209; *Andrews* v. *Cohen,* 221 N. Y. 148; *McDougal* v. *Schumacher,* 236 N. Y. 127.)

*Anson McCook Beard* for respondents. Transactions between fiduciaries and their beneficiaries cannot stand if there has been any failure of disclosure, or personal profit to the fiduciaries, or any advantage taken of the beneficiary. The existence of any antecedent fiduciary relation casts the burden of proving fairness upon the fiduciaries. Here a specific duty of just valuation rested on the executors which they did not meet, although they knew that the valuation fixed was most unjust. (*Blood* v. *Kern,* 130 N. Y. 514; *Bischoff* v. *Yorkville Bank,* 218 N. Y. 106; *Wager* v. *Wager,* 89 N. Y. 161; *Slater* v. *Slater,* 114 App. Div. 160; *Fulton* v. *Whitney,* 66 N. Y. 555; *Matter of Schroeder,* 113 App. Div. 204; *Hammond* v. *Pennock,* 61 N. Y. 145; *Leary* v. *Geller,* 224 N. Y. 56; *Bloomquist* v. *Farson,* 222 N. Y. 375; *Fisher* v. *Bishop,* 108 N. Y. 25.) The fact, established by a finding of the Appellate Division, supported by an abundance of evidence, that this transaction was intended as a distribution, that the price charged for the Dark Island property in the distribution was grossly excessive and that it was unjust and unfair, when the executors were required by the eighth paragraph to distribute on just valuations (equality among all the children was the keystone of the whole will), necessitates the affirmance of the order of the Appellate Division. The existence of a fiduciary relation is not essential. But the law is settled that a fiduciary relation exists between executors and beneficiaries in the division of an estate. (*Blood* v. *Kern,* 130 N. Y. 514; *Bischoff* v. *Yorkville Bank,* 218 N. Y. 106.)

McLAUGHLIN, J. Frederick G. Bourne, a resident of Suffolk county, N. Y., died on the 9th of March, 1919, leaving a will which was admitted to probate on the

17th of the same month and letters testamentary issued to the executors therein named. This proceeding was instituted for the purpose of settling their accounts. The respondents interposed certain objections, only one of which is necessary to be here considered. This objection sought to have the executors' accounts surcharged with the amount received by them from the sale of certain property, real and personal, known as Dark Island. The objection was overruled, but on appeal the decree in this respect was reversed (two of the justices dissenting) and the executors' accounts surcharged with the amount of this item. The present appeal followed.

Mr. Bourne left him surviving as his heirs at law and next of kin seven children, three sons and four daughters. The eldest son, Arthur, and decedent's secretary, Mr. Vail, were the executors named in the will. The youngest daughter, Marjorie, and another daughter, Mrs. Strassburger, are the respondents above named. Mr. Bourne left a large estate, upwards of $41,000,000 of personalty, besides valuable real estate, so that after the expense of administration, inheritance and transfer taxes were paid, each of the children received more than $5,000,000 — the estate, after payment of certain specific legacies, being divided equally among them.

Besides the Dark Island property, located in the St. Lawrence river, the deceased at the time of his death owned valuable real estate on Long Island, and on Jeckyl Island, Georgia. The Dark Island property and other real estate connected with it, including the furnishings of a residence which he had there built, and other personal property, had cost him approximately $389,000. The 8th paragraph of his will reads as follows: " I hereby authorize and empower my executors hereinafter named, their survivor and successors, in their discretion, either for the purpose of a partial or complete division or otherwise, to partition, on valuations determined by them to be just, which shall be binding upon all concerned, or to

sell, either at public auction or private sale, my personal effects and my real estate, or any part thereof, * * * and to make and execute and deliver all proper assignments, deeds, conveyances, mortgages, leases and other necessary instruments in writing."

Three days after his death a meeting took place between the children and the executors and a written request was then made by the former that the latter maintain and keep up Mr. Bourne's residence and farm at Oakdale, the establishment at Dark Island, and Jeckyl Island " in the same manner as heretofore kept up and maintained by him, charging the expense thereof to the residuary estate for a period of three months hereafter and continuing thereafter until we revoke this authority in writing."

About the 11th of April following a meeting took place between the respondent Marjorie Bourne and her brother Arthur, in which, according to her testimony, he told her he had an offer of approximately $500,000 from a Mr. Peacock for the Dark Island property; that she then told him she did not want that property to go out of the family; that her father loved it, and she wanted to keep it; that Arthur then told her she could not afford to buy it, to which she responded she could not help that, but she would not see Mr. Peacock get it, because her father did not like him; that when her brother told her she could not afford to buy it, she said she would see if she could not get her sister, Mrs. Strassburger, to go in with her and make the purchase.

On the 19th of May, 1919, another meeting between the children and the executors took place. At this meeting it was agreed by the children that certain pieces of real estate should be sold to some of them at prices which approximately represented the cost to their deceased father, as shown by his books. As to the Dark Island property, real and personal, it was agreed the executors should endeavor to sell the same " for the best price

possible, but before making any contract for its sale, that they should report the amount that they had been offered and were willing to take, to Mrs. Strassburger and Miss Marjorie Bourne, giving them, or either of them, the privilege of buying the property first at such figure."

On the day following this meeting, Marjorie Bourne testified, on the hearing before the surrogate, that she became very much worried lest the Dark Island property should go out of the family, which she did not want done; that she did not want it offered for sale to the public and so stated to her brother-in-law, Mr. Strassburger; that he advised her not to buy it, but she told him she wanted it, and would like to acquire it before it was offered to any one outside the family; that he said to her possibly her sister, Mrs. Strassburger, would help her buy it; that she asked her sister if she would, and she consented to do so under an arrangement with her that she would buy it back within a certain time; that she then asked her brother-in-law to go to Mr. Vail and make an offer of $370,000 for the property, but not to let her brother Arthur know who was making the offer until the meeting, called between the children and executors for the 26th of May, 1919, took place. The property had, prior to this time, been placed in the hands of a broker to sell and the price put upon it by the executors was $500,000; and the property had been offered by the broker for sale, the attention of several wealthy people being called to it.

The meeting called for the 26th of May took place, all of the children and the executors being present. Marjorie Bourne and Mrs. Strassburger then offered to buy the Dark Island property and pay therefor $389,120.97, which was approximately the amount it had cost their father, as shown on his books. All of the children except one sister consented in writing that the property be sold to them for that figure, and she thereafter orally agreed

1923.]          Opinion, per McLaughlin, J.      [237 N. Y. 341]

to such sale. On the same day a written contract was entered into between the executors, on the one hand, and Marjorie Bourne and Mrs. Strassburger, on the other, by which the former agreed to sell and convey, and the latter agreed to purchase, the Dark Island property at the price heretofore named — $100 being paid down and the balance, $389,020.97, agreed to be paid on or before the 26th of June, 1919, when deeds of conveyance and bills of sale were to be delivered — possession being given immediately. Thereafter, the property was duly transferred and conveyed, the consideration being the price stated in the contract. Immediately following the signing of the contract, Marjorie Bourne and Mrs. Strassburger went into possession, occupied the property for the seasons of 1919 and 1920, and Marjorie Bourne for 1921, and Mrs. Strassburger for a portion of that season.

On the 26th of September, 1921, Mrs. Strassburger transferred and conveyed her interest in Dark Island to Marjorie, who, having ascertained that the property had been appraised for the purpose of transfer and inheritance taxes at between $40,000 and $50,000, sought to have the executors take back the same at the price which she and Mrs. Strassburger had paid. This they refused to do, inasmuch as the other brothers and sisters, with the exception of Mrs. Strassburger, refused to consent thereto. Marjorie thereupon brought an action in the Supreme Court to set aside the deed of conveyance, on the ground of fraud and misrepresentation as to the value, but before that action was tried, the hearing in this proceeding came on and the whole question was tried out in the Surrogate's Court, with the result as before indicated.

The surrogate found " that the said executors in their administration of the estate of said decedent, have acted throughout in good faith and as prudent and intelligent men would act in the management of their own affairs, and with due regard to the best interests of the said estate, and have exercised their best judgment and have

not acted negligently. * * * That the said executors in selling to May B. Strassburger and Marjorie Bourne the so-called Dark Island property * * * acted in good faith and fairly and properly and without any inducements or unfair or improper representations to the said May B. Strassburger and Marjorie Bourne, or either of them, and that *said sale was validly made and is in all respects valid and that no grounds exist for setting the same aside.*"

The findings of the surrogate were unanimously affirmed by the Appellate Division " except as to the matter of the sale of the so-called Dark Island property by the executors to the appellants Marjorie Bourne and May Bourne Strassburger and that as to said matter the finding of the said surrogate that *said sale was validly made and is in all respects valid and that no grounds exist for setting the same aside* is contrary to the evidence and said finding is hereby reversed and annulled by a majority of this court."

The Appellate Division made two findings of its own, viz.:

" 1. That the amount paid by Marjorie Bourne and May Bourne Strassburger for the so-called Dark Island property was grossly excessive and that said fact was well known to the executors at the time the sale was made.

" 2. That such sale to said Marjorie Bourne and May Bourne Strassburger was intended and was made as a partial distribution of the decedent's estate, pursuant to paragraph eighth of his will, and was unjust and unfair."

It will be observed that the finding of the surrogate that the executors, in the administration of the estate, had, in the exercise of their best judgment, acted in good faith and as prudent and intelligent men would act in the management of their own affairs, was not reversed, nor was the finding as to the sale of the Dark Island property, to the effect that in making such sale they also acted in good faith and no inducements or unfair or

improper representations were made to the purchasers to bring about such sale. The only part of the finding relating to the sale of the Dark Island property which was reversed were the words which I have italicized in the findings quoted, which, as I construe them, is more of a conclusion of law than a finding of fact. Such conclusion is not justified so long as the findings in relation to such sale remain undisturbed, that the executors not only acted " in good faith " but fairly and properly, and made no improper or unfair representations to bring about the sale.

It is doubtless true, as found by the Appellate Division in the first finding made by it, that the price paid for Dark Island was excessive and was so considered by the executors. Indeed, one of them, according to Marjorie Bourne's own testimony, had advised her not to purchase it, as did her brother-in-law. The value of property of this character is largely problematical. It rarely can be sold in the open market for what it cost, and it probably could not, to-day, be replaced for that sum. The price fixed upon Dark Island, as upon the other pieces of real estate sold, was what they had approximately cost as shown by the books of the deceased. The residuary legatees all agreed to this method of procedure, and this was the method adopted in each instance. Marjorie Bourne was of full age. She was at least as familiar with the Dark Island property as any of the other children. She was very much attached to her father and spent most of her time with him and especially when he occupied Dark Island. She knew he was very fond of that property and for that reason, as well as others best known to herself, she also was very fond of it. She wanted the property herself and was willing to pay, in order to gratify her wishes in this respect, what it had cost. She was not deceived in any way in making the purchase. She did not rely upon anything the executors told her, for if she had, she would not have purchased it.

But it is suggested that the executors occupied a fiduciary relation to Marjorie Bourne as residuary legatee, and for that reason ought not to have permitted her to acquire the property at a price in excess of its value. I know of no rule of law which imposes upon executors any such duty. If it be true, as contended, that they occupied a fiduciary relation as to Marjorie Bourne, they occupied a similar relation as to the other residuary legatees. They were obligated, as executors, to act for the best interest of the estate. That required them to sell the property at the best price obtainable. Respondents' counsel, appreciating this, seeks to escape the force of it by urging that this was not a sale, but a partial distribution of the decedent's estate, and in this connection calls attention to the second finding made by the Appellate Division. Such finding is not only unsupported by the evidence, but is contrary to it. The evidence clearly establishes it was a purchase and sale and nothing else, and so understood. The testimony of Marjorie Bourne shows it, as does the agreement of the residuary legatees and the written contract to sell, followed by the deed of conveyance. In the face of such evidence, the transaction cannot be tortured into a partial distribution of the estate.

The order of the Appellate Division, therefore, is reversed and the decree of the Surrogate's Court affirmed, with costs payable out of the estate to all parties appearing and filing briefs.

ANDREWS, J. (dissenting). At his death Mr. Bourne left valuable real estate. His executors were authorized in their discretion either for purposes of division among his heirs or otherwise to partition it at a valuation which they shall determine to be just and which valuation is to be binding on all concerned, or to sell it. The proceeds would then be divided among such heirs.

If they sold the property, either to one of the heirs

or to a stranger, dealing with the purchaser, as Judge McLAUGHLIN points out, at arms' length, their duty to the estate required them to effect a sale on terms as advantageous as possible.  They were under no obligation to point out to the intending purchaser that they believed his offer was excessive.  Their knowledge of the true value of the property was immaterial.  If, however, they partitioned the real estate among the heirs they should do it on what they honestly believed to be a just basis, especially in a case where one of the executors was also an heir who would profit personally by not so doing.  If knowing property to be in fact worth but $50,000 they set it off to an heir at a valuation of $389,000, they failed in their plain duty.  This would be so although they made no false representations as to value; even though the heir in ignorance of the fact accepted the partition or even requested that it be made.  In such a transaction she might insist on the utmost good faith, on the disclosure of any facts known to them but not known to her.

If, therefore, the transaction by which Miss Bourne and Mrs. Strassburger acquired title to Dark Island was a sale, the conclusion reached by the surrogate was correct.  If in truth, however, it was a partition and distribution of the estate under the form of a sale, as the amount they were charged for the property was grossly excessive and was at the time known to be so by the executors, he was in error.

The Appellate Division has found " that such sale to said Marjorie Bourne and May Bourne Strassburger was intended and was made as a partial distribution of the decedent's estate, pursuant to paragraph 8 of his will, and was unjust and unfair."  It seems to me that the only question in the case is whether there is any evidence that either directly justifies this finding or fairly permits an inference that it is correct.

I think the record contains such evidence.  At Mr. Bourne's death on March 9, 1919, all his real estate

[237 N. Y. 341]   Dissenting opinion, per ANDREWS, J.        [Feb.,

vested in his heirs, subject to the power in the executors
to sell or to partition it among them.   Three days later
these heirs requested the executors to maintain certain
of these properties, including Dark Island, for a limited
period, charging the expense to the residuary estate.   Evi-
dently they wished time to advise as to their ultimate
disposition.   Miss Marjorie Bourne had an especial affec-
tion for Dark Island, and wished to retain it in the
family.   Originally there was some talk of preserving it
as a family club.   This project failed, but on April 11,
Miss Bourne, in a talk with the executor, Arthur, was
told that an offer of $500,000 had been made for the
property by one Peacock.   She told him of her desires
as to retaining the island in the family and said that she
would not see it go to Peacock as her father had not
liked him.   She wanted to keep it herself.   Her sister
would help her to " buy " it.   She asked Arthur to do
nothing about it until the family meeting.

On May 19th there was a formal meeting of the heirs,
the executors and two or three friends.   There was a
general discussion as to the real estate and other matters
connected with the estate.   Clearly the executors intended
to carry out the powers conferred upon them not arbi-
trarily but only after consultation with those interested.

At this meeting the executors fixed the value of the
various parcels of real estate left by Mr. Bourne at their
so-called " book value," representing the expenditures
made by Mr. Bourne on each.   As to the other properties
this seems to have been fair.   Not as to Dark Island.
The expenditures made thereon had been extravagant.
The " book value " was some $379,000.   Its market value
at the time was between $40,000 and $50,000.   They
then discussed the various parcels.   On three pieces three
of the children were living and they wished to " purchase "
the properties on which they lived.   The word " sell "
was used.   All agreed to this proposition and later three
papers were signed by the heirs, consenting that the

executors sell each parcel to its occupant at its book value on the following terms: " $100 down on the signing of a written contract and the balance of the consideration by charging the same to the distributive share of the said ——— of the estate of the said Frederick J. Bourne." The first of these consents was indorsed " Glen Cove property to George G. Bourne." The second contained a similar indorsement to Arthur K. Bourne. Then came up the question of Dark Island. Arthur asked if any of the family wanted the island or if they were interested in buying it. He knew that several of the heirs were not and if no one there wished to " buy " it, he would have to sell it to an outsider for the best price he could obtain. Mrs. Strassburger and Miss Bourne were to have the refusal of the property at the price at which the executors received an acceptable offer. Arthur preferred that a member of the family should own Dark Island rather than an outsider.

Official minutes of this meeting were kept and they help to explain the meaning of these transactions. The executors were to attempt to sell Dark Island, giving the children named the first privilege to buy. It was agreed " that the executors might convey the property at Glen Cove * * * to George G. Bourne at a price equal to the cost of the property to the testator." So the Ludlow place to Alfred upon condition that in certain contingencies he should offer it to his brothers and sisters " at a price not to exceed the price at which he received the same." So, also, another parcel to Arthur. The prices so fixed were $40,000, $125,000 and $5,500 respectively. Certain property was not to be sold but conveyed to the seven heirs to be used by them in forming a membership corporation. The legatees are to indicate by the next conference whether any of them desire any of the club memberships left by Mr. Bourne. If not the executors will try to sell the same. So

23

whether they wish to take any automobiles at their appraised value or any motor boats. Mrs. Hard, an heir, also wishes to have conveyed to her certain real estate.

In connection with the consents that have been referred to, this paper it seems to me indicates that the trans-actions with the three sons were in no true sense a sale of the several parcels to them, any more than the acceptance by a legatee of a car or a motor boat at its appraised value would be a sale. Within the meaning of the will, which treated all the children equally, it was a partition for purposes of distribution.

After the meeting Miss Bourne became anxious. She knew, or supposed she knew that Peacock had offered $500,000 for Dark Island. She feared a sale outside of the family. She determined to " buy " it and sent word to Arthur that she wanted it. She was advised to " submit a bid " and she did offer $370,000.

The next family conference took place on May 26. At this time all the real estate had been disposed of with the exception of Dark Island and another valuable parcel called Oakdale. It was announced that this bid for Dark Island had been received and Mr. Strassburger stated that it came from his wife and Miss Bourne. Both he and his wife knew of the alleged Peacock offer of $500,000. Neither he nor they could, therefore, have supposed that if this bid was accepted it represented in any true sense a sale by the executors for the best price they could obtain. The matter was discussed. Arthur figured the book value and it came to $389,120.97. Mr. Strassburger then stated that his wife and sister-in-law could not pay " unless it was charged against the resid-uary portion of the estate, which had been done in the other properties." This was acceptable. The boats were put in at their appraised value and the amount finally fixed at the sum stated. All were in accord as to accepting this price and a paper was signed by the heirs consenting

to the " sale " upon the following terms: " $100 down on the signing of a written contract and the balance of the consideration by charging the same in equal half shares to the distributive shares in the estate  *  *  *  of the said May Bourne Strassburger and Marjorie Bourne." Not only is this consent identical with the consents to the transfer to the sons but it was signed on the same day.  In all cases, too, with regard to the sons as well as to the daughters there was the same use of the words " buy " and " sell."  Thereupon the attorney for the executors prepared a contract of sale.  Its provisions differed slightly from the consent.  The consideration need not be paid in cash but by delivery of receipts as residuary legatees and devisees for the amount required, so executed as to be filed on an accounting.

On June 5 the executors were ready to deliver the deed.  They altered, however, the original proposition. As the legatees, they say, are anxious to have an early distribution of the estate they will on June 12th pay to Miss Bourne and Mrs. Strassburger each $175,000 and these two could pay back that amount to apply on their contract.  This was done and personal checks for the amount received were given back.  The same thing was done with regard to the sons except that in each case $175,000 was divided into two checks, one of which represented the amount they were charged for their real estate, and this last check was returned.  The deed was thereafter delivered.  This distribution was made to simplify matters and to avoid interest complications — to avoid cross interest charges between the several distributees.  The transactions with the sons and with the daughters were of the same kind.

In view of all these facts the Appellate Division might fairly infer that this transaction was no sale to the daughters in any true sense.  All Mr. Bourne's estate, real and personal, was to be equally divided between his children.  At least two separate parcels of real

estate had cost him great sums. Dark Island, might not be physically divided into seven parts. If it went without more to his heirs a sale at auction would be the inevitable result of an action in partition — probably at a great sacrifice. Therefore, his executors were empowered to sell it publicly or privately. So they might sell his personal property. Or they might take his stocks, his bonds, his real estate, for purposes of division among his children, and partition it among them at just valuations fixed by them. They might turn over in specie Dark Island to Albert or Arthur. They might turn over its equivalent to another child in Delaware, Lackawanna and Western stock. In essence this is what they did. They said to George we will not set off the Glen Cove property to you at a valuation of $40,000 and compel you to take it. We will not even permit you to take it at that valuation unless the other heirs consent. But if you and they do consent you may take it at that price as a portion of your distributive share of the estate. The others shall be made good from other assets in our hands. These we will turn over to them in specie or we will sell them and pay them the money. They had the power to do this and I think they did it. The exchange of checks on June 12 did not alter the nature of the transaction. It was done merely for convenience in bookkeeping. The use of the words " buy " and " sell " should not blind us to the reality.

If this was the nature of the transaction with George, it was the same transaction with the two daughters. It was a partial division of the estate. Such a division as the executors were empowered to make. And in making it, as was said at the beginning, I think the executors were bound by a continuing duty to fix a fair valuation, as far as their own judgment permitted, upon the portions allotted to each child. I do not mean that they were guardians for the daughters in any sense. I do not mean that they were bound to refuse to set off to them

the island at an exorbitant price if the daughters with all the facts in their minds still desired it. But something similar to a trust relationship existed. If they did know that the price fixed was exorbitant they were bound to reveal that knowledge unless the daughters already possessed it. They did not. Marjorie says she believed a bid for $500,000 had been received.

I think the judgment should be affirmed.

HISCOCK, Ch. J., POUND and LEHMAN, JJ., concur with McLAUGHLIN, J., and CARDOZO, J., concurs in result; ANDREWS, J., reads dissenting opinion, in which CRANE, J., concurs.

Order reversed, etc.